No. 13144

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

GARY EUGENE RADI,

Defendant and Appellant.

---

Appeal from: District Court of the Sixth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Conrad Fredricks and Richard W. Josephson,
Big Timber, Montana
Conrad Fredricks argued, Big Timber, Montana

For Respondent:

Honorable Mike Greely, Attorney General, Helena,
Montana
J. Mayo Ashley argued, Assistant Attorney General,
Helena, Montana
Kenneth R. Olson, County Attorney, Big Timber,
Montana

---

Submitted: June 3, 1977

Decided: APR 19 1978

Filed: APR 13 1978

*Thomas J. Kearney*
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendant, Gary Eugene Radi, appeals from a judgment in Sweet Grass County District Court adjudging him guilty of burglary and from an order sentencing him to 50 years in the Montana state prison as a persistent felony offender.

On September 7, 1974 the Ullman Lumber Company in Big Timber, Montana, was burglarized. Missing from the office was approximately $60 to $80 in cash and $1,100 in checks which were restrictively endorsed. The cash was never recovered, but most of the checks were recovered. Defendant was never directly connected to stolen cash or checks.

Defendant and John Michael Miner were arrested and charged with burglary and theft. In a separate trial Miner was convicted of burglary, sentenced to 10 years in prison, and this Court affirmed his conviction. (See, State v. Miner, (1976), 169 Mont. 260, 546 P.2d 252.) Defendant was tried after Miner's conviction and while Miner's conviction was pending on appeal. Defendant's defense was alibi and that of seeking to establish that Miner was the sole perpetrator of the crime. He also attacked the credibility of one witness, Tim Rostad, who placed defendant inside the burglarized office building on the evening involved.

Tim Rostad is related to the owners of Ullman Lumber Company and is well acquainted with the lumber yard and the internal surroundings of the office building. He also knows all the lumber company employees. On September 7, 1974, at approximately 11:15 p.m., Tim Rostad was talking with three occupants of a car parked across the street from the Ullman Lumber Company. Rostad was kneeling on the driver's side of the car talking to Alan Petaja, Lila Fuller and Debbie Braley. The office building was directly across the street and well lighted inside. Rostad noticed a

stranger inside the office building (later identified as defendant Radi) and told the others. A few seconds later Petaja and Fuller looked and saw an individual inside the office building. Witness Fuller later identified this person as Miner, and Petaja was not certain, although it appears that he also saw Miner. No witness saw two persons simultaneously inside the office building. Rostad then left to call the police. While he was gone Fuller and Petaja saw two shadowy figures in the lumber yard, and Petaja saw them climb over the fence and disappear. Neither witness could identify the individuals in the lumber yard.

Ten or fifteen minutes after Rostad made the phone call, he again saw the man he had seen inside the office building. The man had stopped him to ask for change for the pay telephone. A few minutes later, Officer Ed Brannin, responding to Rostad's telephone call, stopped John Miner adjacent to the lumber yard and obtained identification, questioned him briefly, and let him go. Brannin continued patrolling and a few minutes later came upon Rostad who directed the officer to defendant Radi standing inside a telephone booth. Officer Brannin drove over to the phone booth accompanied by Rostad. After defendant Radi made his call, Officer Brannin asked him to get in the car. The dome light was on in the car, and Rostad again had a clear view of Radi. At trial Rostad positively identified defendant as the man he had seen inside the lumber yard office building, as the man who had asked him for change, and as the man he had seen in the telephone booth and in the patrol car.

Officer Brannin identified Radi as the same person he had seen in the telephone booth and talked to inside the patrol car. He had obtained Radi's driver's license identification and also the license number of the car Radi was driving. A license number check later revealed that the automobile was registered to Radi.

During cross-examination of Officer Brannin, the officer's report of the crime investigation was admitted in evidence. Among other matters, it contained the information that Brannin had checked Radi's criminal background and determined that Radi had previously been convicted of burglary and was then out on bail.

In addition to Rostad and Officer Brannin identifying Radi in close proximity to the scene of the crime, witnesses Fuller and Petaja testified they had seen Radi walking approximately a block away from the lumber yard and a few minutes later saw Radi again while Officer Brannin was obtaining identification from him after he had exited the telephone booth.

Investigation at the lumber yard offices revealed that entry to the building had been gained by breaking a lock and forcing open a sliding door. Between $60 and $80 in cash and approximately $1,100 in checks was missing. Most of the checks were recovered and admitted in evidence through one of the owners of the lumber company.

Although defendant did not testify at his trial, he sought to establish through other witnesses that he was in Billings on the night of the crime and that from the time he was last seen in Billings, it would have been impossible for him to travel to Big Timber by 11:00 p.m. Through two other witnesses, Radi also sought to establish that John Miner was seen earlier that day in Livingston, Montana, some 35 miles west of Big Timber, and therefore that Miner was well within striking distance of the scene of the crime.

Defendant's employer in Billings, Gaylin Garrison, testified defendant worked with him at Garrison's gas station on September 7, 1974 until approximately 9:40 p.m. Cross-examination revealed that Garrison also knew and employed John Miner and that Miner and Radi often worked together at the gas station. Karen Radi, defendant's wife, testified defendant arrived home in Billings

-4-

on September 7, 1974 just a few minutes before 10:00 p.m. She testified Radi left home at approximately 10:15 p.m., pinpointing the time by stating that she was listening to the 10 o'clock news when he left. The thrust of this testimony was to demonstrate that it was impossible for Radi to travel to Big Timber, some 85 miles away, in time to burglarize Ullman's Lumber Company at 11:00 p.m.

To point the finger at Miner as the sole perpetrator of the crime, defendant called two young women, Barbara and Mary Burns, who helped their father operate the Wrangler Bar in Livingston. Barbara Burns testified that on September 7, 1974, she saw John Miner in the bar at approximately 7:00 p.m. Someone was with him, but she could not say it was defendant Radi. Cross-examination revealed that earlier she had given a deposition and testified that the first name of the person with Miner was Gary. She also admitted that when shown a picture of one identified as Gary Radi, she had identified the person in the picture as having been with John Miner.

Mary Burns testified she saw Miner in the Wrangler Bar at 3:00 or 4:00 p.m. on September 7, 1974. He was not there when she left at 7:00 p.m., but he was there when she came back sometime between 9:00 and 10:00 p.m. and appeared to be drunk. At that time, she did not see defendant Radi with him. Cross-examination revealed she saw Miner with defendant Radi in the Wrangler Bar in the early morning hours of September 8, 1974, between 1:00 and 2:00 a.m. This was three or four hours after the burglary in Big Timber.

As the last item of his defense, defendant introduced in evidence the certified record of Miner's conviction for the same offense.

Defendant raises many issues on appeal which are briefly summarized as follows: He contends the trial court improperly denied a challenge for cause to a member of the jury panel who was

a county commissioner and also a part time deputy sheriff; he contends that witness Tim Rostad was improperly allowed to testify after he violated an order excluding witnesses from the courtroom; he contends the testimony of the key witness, Tim Rostad, was "inherently incredible"; he contends the trial court improperly refused an instruction for the lesser included offense of criminal trespassing; he contends he was improperly charged with theft and certain instructions pertaining to the theft charge were in error; he contends that instructions erroneously explained the statutory language of "purpose" or "knowledge"; he contends the jury should have been given a definition of illegal trespass along with the definition of unlawful entry or unlawful remaining in an occupied structure; he contends that two instructions relating to the definition and elements of burglary were repetitive; and finally, he attacks the persistent felony offender statute on several grounds.

During jury selection a Sweet Grass County commissioner, P. R. Esp, who was also a member of the sheriff's posse of that county, was on the jury panel. Defense counsel challenged Esp for cause but failed to state the grounds of his challenge. The trial court denied the challenge. Defendant later excused Commissioner Esp by using one of his peremptory challenges.

Defendant argues an attorney-client relationship existed between the county attorney and the county commissioner. He claims Esp, as a county commissioner, is a client of the county attorney, and thus a challenge for cause should be allowed by statute. He also argues that a deputy sheriff automatically has a state of mind which would disqualify him from being an impartial juror in a criminal case.

The statute does not permit an automatic challenge for cause solely for the reason that a prospective juror in a criminal case is also a county officer. Section 95-1909(d)(2), R.C.M. 1947,

-6-

provides in pertinent part:

> "A challenge for cause may be taken for all
> or any of the following reasons; or for any
> other reason which the court determines:
>
> " * * *
>
> "(ii) Standing in the relation of * * * attor-
> ney and client * * * or being a member of the
> family of the defendant, or of the person
> alleged to be injured by the offense charged,
> or on whose complaint the prosecution was
> instituted, or in his employment."

This section refers only to an attorney-client relationship which exists between the prospective juror and the defendant, between the prospective juror and the victim, or between the prospective juror and the complaining witness.

The simple fact that a county attorney is a legal advisor to a public official who is also a potential juror, does not alone disqualify the public official as a juror. Under similar statutes, in People v. Wilkes, (1955), 44 Cal.2d 679, 284 P.2d 481, 485, a county commissioner was held not disqualified; and in State v. Lewis, (1903), 31 Wash. 75, 71 P. 778, a justice of the peace was held not disqualified.

Defendant next contends that a law officer is automatically prejudiced against a defendant and therefore should be disqualified under section 95-1909(2)(x), R.C.M. 1947, which provides that one can be challenged for cause under the circumstance:

> "(x) For the existence of a state of mind on
> the part of the juror in reference to the case,
> or to either of the parties, which will prevent
> him from acting with entire impartiality and
> without prejudice to the substantial rights of
> either party." (Emphasis added.)

This statute clearly does not provide for an automatic disqualification. Rather, the defendant must show actual prejudice. In State v. Thomson, (1976), 169 Mont. 158, 163, 545 P.2d 1070, we stated:

> " * * *The bare fact that he is connected with
> law enforcement does not, without more, neces-
> sitate a finding that he would not be an impartial
> juror."

Here, defendant made no showing why he challenged for cause other than the verbal act of declaring the challenge. Nor do we find prejudice to defendant because his assertion that he was forced to exercise a peremptory challenge against juror Esp, thereby precluding him from using it on another prospective juror. There is nothing here to show that defendant was deprived of a fair jury panel.

In declaring that one's status as a law enforcement officer does not ipso facto disqualify him from sitting as a juror in a criminal case, we are mindful of the natural inclinations of one whose life is committed to law enforcement. For this reason the widest possible examination should be allowed such person in his examination as a potential juror, and should there be any doubt in the event of a challenge for cause, the trial court should resolve the doubt in favor of allowing the challenge.

The next series of errors complained of revolve around the testimony of witness Rostad. Defendant contends that Rostad was improperly allowed to testify after he was in violation of a pretrial order excluding witnesses until such time as they testified. However, defendant has shown no prejudice, and by not voicing his objection at the time Rostad testified, he waived any right to complain.

After the trial court granted the order excluding witnesses from the courtroom, the State called Rostad as its first witness. However, before he testified, the State decided it should have as its first witness one of the owners of the burglarized lumber yard offices, Forrest Ullman. The prosecution apologized for the mix-up, and the trial court simply told Rostad to step aside, implying that Rostad was to stay in the courtroom. Rostad was not told to leave the courtroom. Accordingly, during the course of Ullman's testimony, Rostad remained in the courtroom with no objection from defendant.

Ullman testified to the physical layout of the lumber yard and its offices and to the cash and checks stolen. The checks were admitted in evidence. Rostad's primary function was to identify Radi as the person he saw inside the office building. We fail to see how Rostad's testimony could have been affected by what he heard from the testimony of Ullman. Moreover, failure to object at the time waived any right to complain of this minor irregularity.

Neither do we find a denial of due process under these circumstances. Defendant's claim is that Rostad was allowed to get a better view of the defendant while he was waiting for Ullman to finish his testimony. Rostad saw Radi inside the office building, he again saw him moments later when Radi asked him for change in order to use the pay telephone, and he viewed him still a third time within a few minutes while Officer Brannin was checking out Radi's identification. Rostad's testimony placing Radi inside the office building was unequivocal. Moreover, we again hold defendant waived any claim of error when, without objection, he allowed Rostad to remain in the courtroom during Ullman's testimony.

Defendant also contends the conviction cannot stand because Rostad's testimony placing defendant inside the office building is "inherently incredible". This argument is based on the possibly conflicting testimony of witnesses Fuller and Petaja. Fuller saw only Miner inside the building, and Petaja was not certain, but his description fit Miner more than it did Radi. Under this doctrine a conviction will only be set aside if the testimony or evidence is so "inherently incredible" that no reasonable mind ought to accept it as true. State v. Crockett, (1966), 148 Mont. 402, 407, 421 P.2d 722. Considering the total circumstances of this case, Rostad's testimony does not fall into that category.

The testimony of each of the witnesses did not preclude both Miner and Radi being inside the building. The fact that both were not seen at one time does not establish that Radi was never inside. Moreover, it is long established that the testimony of one witness is sufficient to establish a fact. Section 93-401-1, R.C.M. 1947; State v. Park, (1930), 88 Mont. 21, 31, 289 P. 1037. The jury was so instructed in this case, without objection from defendant. Rostad's testimony on cross-examination was unequivocal and reinforced his testimony on direct examination:

> "Q. Were you sure that at the time that the Defendant came across the street and asked you for change that he was the one that you saw in Ullman's Lumber Company? A. Yes, I was.
>
> "Q. You were positive at that time? A. Yes, I was.
>
> "Q. Are you positive now? A. Yes.
>
> "Q. Is there any possibility in your mind that you could be mistaken? A. No."

Surely the jury was entitled to accept this testimony as establishing the fact that defendant was inside the building of the Ullman Lumber Company.

Defendant next contends the theft charge should have been dismissed because it arose from the same transaction as the burglary and defendant could not be charged for two offenses. However, different elements must be proven for a charge of theft than for a charge of burglary, and we cannot see error to charge defendant with both offenses. We note also that the jury was instructed to find defendant not guilty of theft if they found him guilty of burglary. Since it did so, we see no prejudice to defendant.

The theft charge is also the basis for defendant's claims that several instructions were in error. Because the jury found defendant not guilty of this charge, there is no need to review these claims of error.

The refusal of the trial court to allow an instruction on the lesser included misdemeanor offense of criminal trespassing is another claim of error. While it is true trespassing is a lesser included offense of burglary under the facts charged here, we do not agree that the evidence justified an instruction.

To commit burglary one has to commit a criminal trespass. Burglary is defined in section 94-6-204(1), R.C.M. 1947:

> "A person commits the offense of burglary if he knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein."

The crime of trespass, as it relates to entry of an occupied building, as charged in this case, is defined by section 94-6-203(1)(a), R.C.M. 1947:

> "A person commits the offense of criminal trespass to property if he knowingly:
>
> "(a) enters or remains unlawfully in an occupied structure * * *"

The only difference between the elements of the two offenses is that in burglary there is the additional requirement of a purpose to commit an offense within the occupied structure. Clearly, criminal trespass is an included offense of the crime of burglary as herein defined.

The essence of defendant's argument is that under a lesser included offense instruction he was entitled to argue that even if the jury found he was in the lumber company building, it could conclude he had merely committed a trespass because he had no purpose to commit the offense of theft while inside. However, there is no evidence in the record from which such an argument could be made. In State v. Bouslaugh, (1978), ____ Mont. ____, ____ P.2d ____, 35 St.Rep. 319, we recently affirmed the viability of the doctrine of lesser included offense. In Boslaugh, quoting from State v. Buckley, (1976), ____ Mont. ____, 557 P.2d 283, 33 St.Rep. 1204, 1207, we stated:

"'* * * the district court's instructions must cover every issue or theory having support in the evidence, and the inquiry of the district court must only be whether or not any evidence exists in the record to warrant an instruction on [the lesser included offense] * * *.'" 35 St.Rep. 321.

Here, defendant's apparent defense was alibi. Through his witnesses he claimed that he was not in Big Timber on the day of the burglary and more particularly, could not have been there at the time the burglary was committed. Not a shred of evidence was admitted which could lead a jury to rationally believe defendant was in the building but that he was in the building for an innocent purpose.

It was defendant who introduced Officer Brannin's investigation report, which indicated defendant had a previous conviction for burglary and was presently out on bail. Furthermore, there was no evidence from which the jury could rationally conclude that defendant had no purpose to commit a theft when he had climbed a high fence, broken a lock on a door to the building, and cash and checks were missing from the office building he had entered. If there was an innocent purpose for being inside the building, it resided solely within defendant's mind, and the jury did not have this evidence. Nor was the nature of defendant's defense consistent with any theory of criminal trespass. Clearly, there was no evidentiary basis for the jury to rationally conclude defendant had committed only a simple trespass.

Defendant next urges that several jury instructions which explained the statutory language of "purpose" and "knowledge" were in error. It is true that Instruction No. 7 is repetitive of Instruction No. 5, but we see no prejudice. Instruction No. 5 told the jury that "purpose or knowledge" can be proved by either direct evidence or inferred from the "acts, conduct and circumstances appearing in evidence." Instruction No. 7 told the jury that "knowledge" can be proved by either direct evidence or inferred

from the "acts, conduct and circumstances appearing in evidence."

Next, defendant complains that the word "purposely" in Instruction No. 6 deviated from its statutory definition contained in section 94-2-101(53), R.C.M. 1947. We note, however, that Instruction No. 6 quotes this section in all material respects. Similarly, he complains that the word "knowingly" as defined in Instruction No. 8 differs from the definition contained in section 94-2-101(28), R.C.M. 1947. Again, we see no material departure.

The jury was given an instruction defining unlawful entry or unlawful remaining in an occupied structure. Defendant contends that this instruction is incomplete because it failed to also contain a definition of illegal trespass upon land as defined in section 94-6-201(1), R.C.M. 1947. We see no necessity for this instruction when defendant was not charged with illegal trespass upon land. Accordingly, the instruction as given was complete and defendant's offered instructions seeking to add the definition of illegal trespass upon land, were properly refused.

In his last assignment of error concerning jury instructions, defendant contends Instruction No. 12, which set forth the elements of burglary and what the State must prove, was repetitious of Instruction No. 9 which set forth the definition of burglary. Both instructions served a needed purpose. The first provided a simple definition of burglary. The second set forth each of the elements of burglary as they related to the particular charge and stated that each element must be proved beyond a reasonable doubt.

Defendant also mounts several attacks on the persistent offender statutes under which he was sentenced to 50 years in prison. He claims he was denied procedural due process because the statute which sets out the circumstances under which one can be sentenced as a persistent felony offender (section 95-1507, R.C.M. 1947) must stand alone unaided by any other statute. Assuming his premise to

be correct, he then contends that section 95-1507 is unconstitutional because it contains no procedural guidelines and safeguards for notice, hearing, and proof of the previous felony convictions. He further asserts that the persistent felony offender statute is in violation of Article II, Section 28, 1972 Montana Constitution, because it allows punishment for previous felony convictions after state supervision has been terminated. And last, he contends that the State did not prove the previous felony convictions.

We note first that the State followed the procedural guidelines and safeguards of section 95-1506, R.C.M. 1947, even though defendant claims the State cannot be aided by this statute. Under this statute, the State served notice on defendant before trial that it would seek increased punishment if he was convicted; the State specified the prior convictions of defendant; the State did not disclose to the jury or the public that defendant had a prior felony record and that it was seeking increased punishment; after defendant was convicted, the State filed the notice and proof of service with the court; and last, a sentencing hearing date was set to give defendant sufficient time to meet the allegations. In fact, defendant missed his court date and was arrested, and the court then set another date for the sentencing. At the hearing defendant was represented by court appointed counsel.

Defendant's argument centers around the changes that were made when this State adopted a new procedural criminal code (Title 95, Revised Codes of Montana) and several years later adopted a new substantive criminal code (Title 94, Revised Codes of Montana). Before the changes, both substantive and procedural statutes were contained in Title 94. In the process of adopting a new Title 94, some of the old procedural provisions in that title were shifted to Title 95, the criminal procedure title.

Under the old Title 94, section 94-4713, R.C.M. 1947, set forth the circumstances under which one could be sentenced as a persistent felony offender. However, the procedural guidelines and safeguards which had to be followed were set forth in section 95-1506, R.C.M. 1947, with subsection (d) providing:

"(d) The hearing shall be held before the court alone. If the court finds any of the allegations of prior convictions true, the accused shall be sentenced under the provisions of section 94-4713."

In 1974, the new substantive criminal code went into effect, and of course, the old Title 94 was repealed. (Chapter 513, Laws of 1973, Section 32.) Included in this repeal was section 94-4713. However, Chapter 513, Laws of 1973, Section 5, specifically provided:

"There is a new section to be numbered 95-1507, R.C.M. 1947, which reads as follows:

"95-1507. Sentence of Imprisonment for Persistent Felony Offender.

" * * *" [Here, the entire statute was set out verbatim.]

In spite of this language substituting section 95-1507 for the previous 94-4713, defendant maintains that section 95-1506 cannot supply the procedural safeguards for section 95-1507. Based on his premise that section 95-1507 must stand alone, he argues that defendant has been deprived of due process in several ways. Of course, these arguments fail if sections 95-1506 and 95-1507 can be construed together. We see no problem in construing these statutes together to provide both the procedural requirements and substantive basis for implementing persistent felony offender sanctions. That is precisely what the legislature intended.

The legislature intended that the new section 95-1507 be a substitute for the old 94-4713. This being the case, there is no need to discuss defendant's remaining arguments that he was deprived of due process. He was given due process in this case under section 95-1506. The prosecuting attorney and the District Court properly

treated this statute as a companion statute to section 95-1507.

Defendant's next contention is that Article II, Section 28, 1972 Montana Constitution, prevents the enforcement of a persistent offender statute such as section 95-1507 because the statute improperly limits the rights of a felon after state supervision has terminated. Article II, Section 28, 1972 Montana Constitution provides:

> "Rights of the convicted. Laws for the punishment of crime shall be founded on the principles of prevention and reformation. Full rights are restored by termination of state supervision for any offense against the state."

Section 95-1507, as previously discussed, is the substantive section of the persistent felonly offender statutes, and provides:

> "95-1507. Sentence of imprisonment for persistent felony offender. (1) A persistent felony offender is an offender who has been previously convicted of a felony and the present offense is a second felony committed on a different occasion than the first.
>
> "(2) A persistent felony offender shall be imprisoned in the state prison for a term of not less that five (5) years nor more than one hundred (100) years providing:
>
> "(a) the previous felony conviction was for an offense committed in this state or any other jurisdiction for which a sentence to a term of imprisonment in excess of one (1) year could have been imposed; and
>
> "(b) less than five (5) years have elapsed between the commission of the present offense and either,
>
> "(i) the previous felony conviction or
>
> "(ii) the offenders released on parole or otherwise from a prison or other commitment imposed as a result of the previous felony conviction; and
>
> "(c) the offender was more than twenty-one (21) years old at the time of the commission of the new offense.
>
> "(3) A previous felony conviction shall not be considered for the purpose of sentencing under this section if the offender has been pardoned on the grounds of innocence, or if the conviction had been set aside in any post-conviction hearing."

-16-

Under this statute a person can be treated as a persistent offender if he is over the age of 21 at the time of the commission of the second felony and if either of two conditions is met: (1) If less than five years has elapsed between the time of commission of the first and second offense; or (2) if less than five years has elapsed from the time he has been discharged from a felony commitment and the commission of a subsequent felony.

Because of the constitutional provision, however, defendant argues that even if five years has not elapsed under the statute a person cannot be sentenced as a persistent felony offender if state supervision has terminated within that time. Even assuming the defendant to be correct, we note that he could not take advantage of the provision he invokes. In the Carbon County conviction, state supervision had not terminated. In fact, at the time of trial, defendant's conviction was then pending on appeal, and was later affirmed by this Court. State v. Radi, (1975), 168 Mont. 320, 542 P.2d 1206.

In any event, we cannot construe Article II, Section 28 in the manner that defendant desires. In State v. Gafford, (1977), ____ Mont. ____, 563 P.2d 1129, 34 St.Rep. 313, the defendant contended he could not be impeached through proof of a prior conviction of a felony because of Article II, Section 28. To this assertion this Court responded:

> "In our view the constitutional provision refers
> to those rights commonly considered political
> and civil rights incident to citizenship such as
> the right to vote, the right to hold public of-
> fice, the right to serve as a juror in our courts
> and the panoply of rights possessed by all citi-
> zens under the laws of the land. It has no
> reference to an individual's characteristics,
> record, or previous conduct demonstrated by a
> prior felony conviction." 34 St.Rep. 319.

Article II, Section 28 grants an offender who has served his sentence a fair opportunity to enjoy the rights that law-abiding citizens enjoy. It does not grant him immunity from being treated as a persistent felony offender.

Defendant's last contention is that the State failed to prove he was a persistent felony offender. In the case of the Yellowstone County burglary conviction, he contends the State failed to prove he was the person named in the certified judgment of conviction and certified prison records of his admission and discharge from the state prison. On the other hand, while he admits the State proved his identity and the fact of conviction in the Carbon County burglary conviction, he contends that since his conviction there was pending on appeal, it could not serve as a basis to invoke the persistent felony offender statutes.

During the sentencing hearing, the State proved the Yellowstone County conviction by introduction of a certified copy of a judgment from Yellowstone County. The record reveals only that the judgment was offered and admitted in evidence. The State also introduced in evidence a certified statement from the keeper of the records at Montana state prison in Deer Lodge that Gary Eugene Radi had been received by the prison from Yellowstone County on September 7, 1967 and had been discharged from prison on February 5, 1971. No evidence was offered to independently establish that the Gary Eugene Radi convicted in Yellowstone County and released from the state prison was the same person as the Gary Eugene Radi then standing before the court. The apparent purpose of admitting the prison records was to establish that less than five years had elapsed from the date of prison release until the commission of the subsequent felony in Sweet Grass County.

Defendant contends that the certified judgment and the prison certification of the dates the person named in the judgment was admitted to and was discharged from the state prison were not sufficient to establish identity. The State agrees these records did not establish identity, but baldly argues the District Court had the right to rely on other information not of record to estab-

lish identity. The State argues that defendant appeared before the same district judge as a witness in an unrelated case in a different county, and contends that this was sufficient for the trial judge to know defendant and his background. The State further contends that on the day of sentencing another judge in the courtroom knew the defendant and his background and could have so informed the sentencing judge. Not only are these unsupported assertions, but even if true, they would not establish defendant's identity as the person who committed the Yellowstone County burglary.

In State v. Cooper, (1971), 158 Mont. 102, 489 P.2d 99, we discussed the persistent felony offender statutes which had recently been enacted. We distinguished them from the previous persistent offender statues where the jury made a determination as to whether a defendant had been convicted of a prior felony. Under the new statutes, proof of the prior conviction is made part of the sentencing process. Nevertheless, we held that identity of defendant as the person who committed the prior felony must be proven by competent evidence. There, we held that the records relied upon were not sufficient to establish defendant's identity and we remanded the case for a rehearing on that question.

We do not agree, however, with defendant's contention that the Carbon County conviction cannot be considered because it was pending on appeal at the time of sentencing. Defendant admits the proof was sufficient to prove the Carbon County felony conviction. In addition to a certified copy of the judgment, the sheriff from Carbon County testified that the defendant presently standing before the court was the same person who had been convicted of burglary in Carbon County. The sheriff had personally participated in the trial of defendant and was present when he was sentenced. Defendant contends that despite this proof, it would be extremely unjust to sentence a person to increased punishment as a persistent felony

offender if it is based upon a conviction that is later overturned on appeal.

The majority rule favors defendant's position, but we are not persuaded by it. Defendant's fears in the event of a reversal of the first conviction are unfounded. We do not believe a defendant should be able to avoid the consequences of his persistent felony conduct solely because of the fortunate circumstance that his previous felony conviction was pending on appeal at the time of sentencing.

In the event that defendant's conviction is reversed on appeal, the status of defendant as a persistent felony offender ceases. If the charges are ordered dismissed, defendant would have to be resentenced without regard to the persistent felony offender statutes. If a new trial is ordered, defendant would still have to be resentenced without regard to the persistent felony statutes. Section 95-1507(1), R.C.M. 1947, would dictate this result:

> "(1) A persistent felony offender is an offender who has been previously convicted of a felony and the present offense is a second felony committed on a different occasion than the first."

Obviously, a reversal granting a new trial would erase the previous conviction and eliminate the basis to sentence defendant as a persistent felony offender.

Nor do we find any language in section 95-1507(3), R.C.M. 1947, to support defendant's position. That section provides:

> "(3) A previous felony conviction shall not be considered for purpose of sentencing under this section if the offender has been pardoned on the grounds of innocence, or if the conviction has been set aside in any post-conviction hearing." (Emphasis added.)

The emphasized language clearly indicates that the action nullifying the conviction must have preceded the sentencing hearing. A felony conviction which is pending on appeal does not fall into that category.

Clearly therefore, the Carbon County burglary conviction was sufficient to establish the right of the District Court to adjudge defendant as a persistent felony offender. We cannot be certain, however, that the District Court would have sentenced defendant to 50 years if the District Court had ruled that the State did not prove identity in the Yellowstone County burglary conviction. We also note that the District Court did not order a presentence investigation and had no previous presentence investigations. It appears that defendant was sentenced to 50 years solely because the District Court determined he had committed the Carbon County and Yellowstone County burglaries.

After the state rested its proof on the prior felonies, the court immediately sentenced defendant to 50 years in prison. Concerning the prior felonies, the District Court then stated:

> " * * * We instruct juries that they are not to forsake their common sense as men and women when they serve as jurors, and certainly there is nothing that says that a Judge has to fail and forget his common sense. This is Gary Eugene Radi, and the Gary Eugene Radi that was in Billings; and it was Gary Eugene Radi that was in Red Lodge; and Gary Eugene Radi that I am sentencing to the State Prison. And Gary Eugene Radi, if there ever was a persistent felony offender, it is Gary Eugene Radi. Take him. Court's in recess."

Although the State proved defendant's status as a persistent felony offender, the need for a pre-investigation was not thereby eliminated. In determining the sentence of a persistent felony offender, the trial judge has a vast range of choices, from a minimum of five years to a maximum of one hundred years in prison. (Section 95-1507(2), R.C.M. 1947.) The criminal history and other background which could be established through a presentence investigation report is as important to a sentencing judge in choosing the sentence, as it is when one comes for the first time before a court to be sentenced for a felony. Certainly, the consequences are much

greater for one who is to be sentenced as a persistent felony offender. For this reason, the presentence investigation report is a vital tool of the District Court in arriving at what it considers to be the proper sentence.

For the foregoing reasons we affirm the judgment of the conviction and the court's order adjudging defendant to be a persistent felony offender. We remand for resentencing for the reasons expressed herein.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices